**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LINDA PRATT, individually and as a personal representative on behalf of TARIK PRATT, an incompetent person, | Civ. No. 15-5779 |
| Plaintiff, | **OPINION** |
| v. | |
| ANN KLEIN FORENSIC CENTER *et al.*, | |
| Defendants. | |

THOMPSON, U.S.D.J.

## INTRODUCTION

This matter comes before the Court upon the Motion for Summary Judgment filed by Defendants Ann Klein Forensic Center ("AKFC"), Ancora Psychiatric Hospital ("Ancora"), Dr. Safeer Ansari, Dr. Dariusz Chacinski, Linda Elias, Dr. Elaine Martin, and Dr. Benito Marty (collectively, "Defendants"). (ECF No. 92.) Plaintiff Linda Pratt ("Plaintiff"), individually and on behalf of her son Tarik Pratt ("Tarik"), opposes. (ECF No. 94.) The Court has decided the Motion based on the parties' written submissions and without oral argument, pursuant to Local Civil Rule 78.1(b). For the reasons stated herein, Defendants' Motion for Summary Judgment is granted in part and denied in part.

## BACKGROUND

Plaintiff brings this action as a representative on behalf of her son, Tarik, an incompetent person who was civilly committed at Defendants AKFC and Ancora, two psychiatric hospitals located in New Jersey, due to a traumatic brain injury he had suffered years before. (Defs.'

Statement of Undisputed Material Facts ("SUMF") ¶¶ 1–2, ECF No. 92-2.) Tarik first became a patient at Defendant AKFC on June 2, 2011. (*Id.* ¶ 3.) On May 8, 2015, he was transferred from Defendant AKFC to Defendant Ancora, but on October 28, 2015, he was transferred back to Defendant AKFC. (*Id.* ¶¶ 4–5.) Plaintiff alleges that during Tarik's stay at these two facilities, he was subject to (1) isolation and seclusion; (2) abuse, neglect, and retaliation; and (3) overmedication. (*See* Defs.' Br. at 2–3, ECF No. 92-1.)

## I.      Isolation and Seclusion: Defendants Chacinksi and AKFC

Defendant Chacinski, a staff clinical psychiatrist at Defendant AKFC, began treating Tarik when he was transferred to his unit on June 13, 2011, shortly after Tarik arrived at Defendant AKFC. (Pl.'s Suppl. SUMF at 8, ECF No. 94-2.) Defendant Chacinksi referred to Tarik as agitated, irrelevant, talking with no sense, and paranoid. (*Id.*) In order to make him more sedated and less agitated, he prescribed Thorazine on August 25, 2011. (*Id.* at 8–9.) Thorazine is a medication that can be used as an antidepressant, antipsychotic, or mood stabilizer. (Ansari Dep. 19:15–19, ECF No. 94-16.) Because he was "still psychotic and agitated," Tarik's dosage of Thorazine was gradually increased until it reached 600 milligrams per day on September 12, 2011. (Pl.'s Suppl. SUMF at 9; Chacinski Dep. 38:19–39:8, ECF No. 94-6.) After that, the dosage was gradually decreased until January 11, 2012, when Tarik was taken off Thorazine completely and transferred to another psychotropic drug. (Pl's Suppl. SUMF at 16, 20.)

During the weekend of September 16, while Tarik was still on Thorazine, staff members found him engaging in sexual conduct with another patient. (*Id.* at 9–10; Chacinski Dep. 39:18–40:16; *see also* Incident Report 1, ECF No. 94-9; Incident Report 2, ECF No. 94-10.) Three days later on September 19, Defendant Chacinksi transferred Tarik to Unit 2, an intensive

treatment unit ("ITU") typically reserved for violent or self-injurious patients requiring more supervision. (Pl.'s Suppl. SUMF at 2, 9.) Defendant Chacinski described Tarik as psychotic, delusional, and unstable at the time. (Chacinski Dep. 39:18–40:16.) Plaintiff contends that Defendant Chacinski violated Tarik's substantive due process rights of care and protection by placing him in more restrictive housing than necessary as punishment for in-facility conduct that violated the institution's rules or policies. (Pl.'s Br. at 14, 29, ECF No. 94.) Plaintiff also argues that Defendant AKFC discriminated against Tarik by keeping him in ITU for longer than necessary. (*Id.* at 22–22.)

## II.    Alleged Abuse, Neglect, and Retaliation: Defendant AKFC

On October 28, 2011, Plaintiff's counsel wrote a letter to Defendant AKFC requesting reports, notes, and documents relating to the incident on the weekend of September 16, 2011. (Request Letter, ECF No. 94-13.) On December 6, 2011, Plaintiff's counsel submitted to Defendant AKFC a document purporting to be a Notice of Tort Claim pursuant to the New Jersey Tort Claims Act, N.J.S.A. § 59:8-4. (Notice Letter, ECF No. 94-15.) After the Notice of Tort Claim was served, Plaintiff contends that staff members at Defendant AKFC abused Tarik in retaliation. (Pl.'s Suppl. SUMF at 28.) For example, she avers that Tarik told her that staff members at Defendant AKFC punched Tarik in the eye, starved him, encouraged him to punch walls causing abrasions on his knuckles, neglected him to the point of contracting MRSA and sleeping in his own urine, hit him during the night, shackled and restrained him, and held him while other patients punched him.[1] (*Id.* at 28–29.) Defendants dispute these allegations of abuse.

---

[1] Plaintiff also alleged that staff members at Defendant AKFC broke Tarik's glasses and delayed replacing them, but she abandoned that claim in her Opposition. (*See* Pl.'s Br. at 15.)

### III. Alleged Overmedication: Defendant Ansari

Plaintiff alleges that Defendant Ansari prescribed an inappropriate amount of Thorazine to Tarik while he was treating him at Defendant Ancora in 2015. Defendant Ansari had been a staff clinical psychiatrist at Defendant Ancora since 2012. (Pl.'s Suppl. SUMF at 20.) He became responsible for Tarik's medication on May 8, 2015, the day Tarik was transferred to Defendant Ancora. (*Id.* at 20–21.) Over the next few months, Tarik was involved in several physical altercations, demonstrating a propensity for violence and aggression. (*Id.* at 21–22.)

Because he was gradually getting worse, on August 31, 2015, Defendant Ansari ordered that Tarik take fifty milligrams of Thorazine four times per day. (*Id.* at 22.) Defendant Ansari explained the rationale for the decision:

> We were looking for something that would work to help him calm down if he's violent and aggressive. When you are in that situation and somebody is attacking you . . . . it's very scary and some people can get hurt . . . . [I]f people are being extremely violent and dangerous and it's putting the lives of other patients on the ward in jeopardy, if it's putting the life of staff that are mainly just middle aged women trying to control a very strong aggressive man who is very muscular and knows Karate and is very impulsive and nobody is there to help them . . . it's a very dangerous and precarious situation.

(Ansari Dep. 50:17–52:23.)

Shortly afterwards, however, Tarik was involved in physical altercations on September 1 and September 2, 2015. (Pl.'s Suppl. SUMF at 22–23.) And as a result, Defendant Ansari discontinued Tarik's Thorazine on September 3 because it "didn't help him [and] he was still aggressive." (Ansari Dep. 61:22–63:6 ("There was no benefit to that medication. I was concerned if [*sic*] he was getting worse. He doesn't communicate well because of his traumatic brain injury. . . . It's trying to figure out what's going on with somebody.").)

For the next few weeks, Tarik was off Thorazine, but his behavior did not change much. (*See* Pl.'s Suppl. SUMF at 23–24.) Defendant Ansari described Tarik's behavior as unstable, violent, and aggressive on September 16; and bizarre, unpredictable, and assaultive on October 23. (*Id.* at 24.) And during the weekend of October 23, Tarik attempted to bite a staff member. (*Id.* at 23–24.) Defendant Ansari testified that Tarik had become "quite violent . . . . paranoid, disorganized, aggressive towards both peers and staff," and "very threatening." (Ansari Dep. 67:9–68:10.)

As a result, on October 26, 2015, Defendant Ansari put Tarik back on Thorazine and ordered "two-to-one precaution," wherein only male staff would interact with Tarik. (*Id.*) Plaintiff contends that Defendant Ansari prescribed Thorazine on October 26 despite having discontinued it on September 3 and that he thus understood its ineffectiveness for Tarik. (Pl.'s Resp. to Interrog. No. 3, Ex. B, ECF No. 92-3.) This second prescription of Thorazine, Plaintiff argues, breached Defendant Ansari's affirmative duty to care for and treat involuntarily committed persons in custody and thus violated Tarik's substantive due process rights of care and protection. (Pl.'s Br. at 8.)

Defendant Ansari maintains that this second prescription was appropriate. He testified that "Thorazine was used to deter [Tarik's] violence, to see if it would help him, because nothing else [was] working."[2] Defendant Ansari also explained, "Psychiatry is not an exact science; it's

---

[2] *See* Ansari Dep. 50:17–52:23 (explaining thought process behind prescribing Thorazine), 71:5–72:7 ("[T]he trial of Thorazine [in September 2015] did not make [Tarik] worse. The medication didn't make him violent. Violence is not a side effect of medication. Violence is violence. . . . We can use medicine to help deter and diminish behavior, but if somebody is violent, they're violent. There is no cure for that. That's based on anti-social personality disorder. . . . in addition to being schi[]zophrenic. Most schi[]zophrenics don't bite people, most schi[]zophrenic people aren't that violent. They are stable in the community, not violent. . . . [Tarik] is very violent. It's not because he's schi[]zophrenic. He's violent because he's a violent person. . . .").

trial and error . . . . There is no laboratory test to see what dose of medicine is going to be helpful

or not helpful. We try to do the best according to our judgment and clinical experience."

(Ansari Dep. 62:14–19.) Defendants argue that Plaintiff fails to provide any expert testimony to

the contrary and that Plaintiff's claim regarding proper patient care is actually a "disguised claim

for medical malpractice." (*See* Defs.' Br. at 20–21.)

Tarik was transferred back to Defendant AKFC two days later on October 28, 2015. (*Id.*)

In anticipation of Tarik leaving Defendant Ancora, Defendant Ansari prepared a "discharge

summary" indicating that Tarik's medication "remain[ed] pretty much the same" during his brief

stay at Defendant Ancora as when Tarik was placed at Defendant AKFC beforehand. (*See*

Ansari Dep. 72:16–74:20 ("Obviously there are medicine changes. . . . But the fact remains that

we were trying to maintain the same medicines that he was on at [Defendant AKFC] and there

were some medicine changes that did occur.").) However, Defendant Ansari did not mention

Thorazine in the discharge summary, to which Defendant admits: "If Thorazine was omitted, it's

an error. I don't recall. It wasn't intentional." (Ansari Dep. 77:4–7.) Plaintiff contends that a

reasonable jury could infer from this omission that Defendant Ansari's proffered reason for

prescribing Thorazine a second time is not credible. (Pl.'s Br. at 8.)

Upon his return, Defendant AKFC placed Tarik in ITU, noting that Tarik was still

aggressive and violent. (Pl.'s Suppl. SUMF at 26.) Specifically, one doctor referred to Tarik as

psychotic, bizarre, delusional, hostile, easily agitated, and uncooperative. (Marty Dep. 11:13–

12:10, Ex. E, ECF No. 92-3.) A doctor noted Tarik's "long history of mental illness with

multiple psychiatric hospitalizations and extremely violent behaviors" and referred to his recent

attempts at biting a staff member and striking a nurse between the legs. (*Id.*) Because of this,

Defendant AKFC submits, Tarik was placed in ITU. Although Tarik was taken out of ITU about

a month later, he still exhibited bouts of disorganization and paranoia.  (Pl.'s Suppl. SUMF at 26.)

## IV.    Procedural History

Plaintiff, on behalf of Tarik, filed the Complaint on July 27, 2015.  (ECF No. 1.)  She subsequently filed amended versions on August 31, 2015 (ECF No. 3); October 6, 2015 (ECF No. 5); and November 1, 2015 (ECF No. 8).  On February 18, 2016, the Court dismissed Defendants AKFC and Ancora on the basis of sovereign immunity under the Eleventh Amendment.  (Op. at 5–6, ECF No. 36; Order, ECF No. 37.)

On August 15, 2017, Plaintiff filed a separate complaint, based on the same factual predicate, in New Jersey Superior Court.  (Rmv'l ¶ 1, Civ. No. 17-6865, ECF No. 1.) Defendants removed that action to federal court.  (*See id.*)  On October 2, 2017, Plaintiff dismissed the separate action and instead filed the Fourth Amended Complaint in this action. (ECF No. 55.)

On May 10, 2018, Plaintiff filed the Fifth Amended Complaint, the operative complaint. (5th Amend. Compl. at 1, ECF No. 71.)  The Fifth Amended Complaint alleges six counts: (1) speech and petition rights violations via 42 U.S.C. § 1983 and the New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. § 10:6-1, against all Defendants (5th Amend. Compl. at 4–10); (2–3) substantive due process violations via § 1983 and the NJCRA against Defendants Ansari, Chacinski, Elias, Martin, and Marty (5th Amend. Compl. at 10–18); (4) various state statutory violations[3] against all Defendants (*id.* at 18–19); (5) discrimination pursuant to the Americans

---

[3] Various subsections regarding management and operation of institutions pursuant to N.J.S.A. §§ 30:4-24, 4-24.1, 4-24.2, 4-27.1, 4-27.13, 4-27.14, and 4-27.16; and the Developmentally Disabled Rights Act pursuant to N.J.S.A. §§ 30:6D-4, 6D-5, and 6D-9.  (5th Amend. Compl. at 18.)

with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. § 10:5-12(f)(1), against Defendants AKFC and Ancora (5th Amend. Compl. at 19–21); and (6) retaliation pursuant to the ADA, § 12203, and NJLAD, N.J.S.A. § 10:5-12d, against Defendants AKFC and Ancora (5th Amend. Compl. at 22–23).  On September 6, 2018, the Court denied in its entirety a motion to dismiss brought by Defendants AKFC and Ancora.  (ECF Nos. 79–80.)

On March 29, 2019, Defendants filed the instant Motion for Summary Judgment.  After an extension of time (ECF No. 93), Plaintiff opposed on May 6, 2019.  Defendants replied on June 4, 2019.  (ECF Nos. 100–01.)  The Motion is currently before the Court.

## **LEGAL STANDARD**

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it will "affect the outcome of the suit under the governing law."  *Id.*  When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party."  *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983).

In resolving a motion for summary judgment, a district court considers the facts drawn from "the pleadings, the discovery and disclosure materials, and any affidavits."  *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002) (internal quotations omitted).  The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. More precisely, summary judgment should be granted if the evidence available would not support a jury verdict in favor of the nonmoving party. *Id.* at 248–49. The Court must grant summary judgment against any party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## **DISCUSSION**

As a preliminary matter, Plaintiff has agreed to dismiss the following claims: Count I against all Defendants; Count III against Defendants Elias, Martin, and Marty; and Count IV against Defendants Elias, Martin, and Martin. (*See* Letter from Peter Kober to Robert J. McGuire (Feb. 8, 2019), Ex. C, ECF No. 92-3; *see also* Defs.' Br at 3; Defs.' SUMF ¶¶ 7–8.) Plaintiff also summarized in her Opposition the remaining claims and omitted Defendant Ancora from Counts V and VI. Because of this omission and because the factual circumstances underpinning these counts—alleging discrimination and retaliation—exclusively focus on events wherein Tarik was under Defendant AKFC's custody, the Court dismisses these claims against Defendant Ancora. As a result, the Court addresses each of the outstanding claims: (Counts II–III) substantive due process violations pursuant to § 1983 and the NJCRA against Defendants Ansari and Chacinski; (Count IV) state statutory violations against Defendants AKFC, Ancora, Ansari, and Chacinski; (Counts V) discrimination pursuant to the ADA and NJLAD against Defendant AKFC; and (Count VI) retaliation pursuant to the ADA and NJLAD against Defendant AKFC. (*See id.*; Pl.'s Br. at 30.)

## I.      Substantive Due Process Violations Pursuant to § 1983 and the NJCRA against Defendants Ansari and Chacinski (Counts II–III)

Plaintiff's claims arise under 42 U.S.C. § 1983, "which provides a cause of action for any person who has been deprived of rights secured by the Constitution or laws of the United States by a person acting under color of law." *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007) (internal citation omitted).  Individual defendants in a § 1983 case, however, are protected by the doctrine of qualified immunity.  "The doctrine of qualified immunity shields government officials who perform discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Santini v. Fuentes*, 795 F.3d 410, 416–17 (3d Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The Supreme Court has articulated a two-part test for analyzing claims of qualified immunity.  *See Bayer v. Monroe Cnty. Children & Youth Servs.*, 577 F.3d 186, 191–92 (3d Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

> First, the court must determine whether the facts alleged show that the defendant's conduct violated a constitutional or statutory right.  If so, the court must then determine whether the constitutional or statutory right allegedly violated by the defendant was "clearly established."  If the court concludes that the defendant's conduct did violate a clearly established constitutional or statutory right, then it must deny the defendant the protection afforded by qualified immunity.

*Williams v. Bitner*, 455 F.3d 186, 190 (3d Cir. 2006) (citing *Saucier*, 533 U.S. at 201).  Summary judgment is warranted if the defendant carries his burden in regard to either prong.  *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012).

A.    *Whether the Conduct Constituted a Constitutional Violation*

1.    Overmedication: Defendant Ansari

The Due Process Clause of the Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "Thus, the Due Process Clause restricts what a state may take away, but it generally does not impose any affirmative 'duty to provide substantive services.'" *Fialkowski v. Greenwich Home for Children, Inc.*, 921 F.2d 459, 465 (3d Cir. 1990) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 317 (1982)). However, "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 198 (1989). For example, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199–200. The Supreme Court recognized such a right in *Youngberg v. Romeo*, wherein it held that "when the state deprives an individual of liberty through involuntary commitment proceedings, it undertakes an affirmative obligation to confine the individual under 'conditions of reasonable care and safety' that are 'reasonably nonrestrictive.'" *Torisky v. Scheiker*, 446 F.3d 438, 443 (3d Cir. 2006) (quoting *Youngberg*, 457 U.S. at 324).

In the context of medical professionals, the Supreme Court has emphasized that "courts must show deference to the judgment exercised by a qualified professional" and that "there certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions." *Youngberg*, 457 U.S. at 322–23.

> [T]he [treatment] decision, if made by a professional, is presumptively valid;
> liability may be imposed only when the decision by the professional is such a
> substantial departure from accepted professional judgment, practice, or standard
> as to demonstrate that the person responsible actually did not base the decision on
> such a judgment.

*Id.* at 323. Therefore, the state has an "affirmative obligation to confine [an involuntarily committed] individual under 'conditions of reasonable care and safety' that are 'reasonably nonrestrictive'" and that "comport fully with the purpose of [the individual's] commitment." *Torisky*, 446 F.3d at 443 (quoting *Youngberg*, 457 U.S. at 324).[4]

Here, Plaintiff does not offer a single opinion, report, deposition, or affidavit from a medical professional to demonstrate that Defendant Ansari's prescribing of Thorazine on October 26, 2015 despite having discontinued it on September 3, 2015 was a "substantial departure from accepted professional judgment." Rather, Plaintiff merely contends that the "common knowledge of lay persons is sufficient to enable them to identify that [Defendant] Ansari's proffered reason for prescribing Thorazine a second time isn't credible." (Pl.'s Br. at 4.) She speculates that reasonable jurors could conclude that Defendant Ansari "opt[ed] for an easier and less efficacious treatment," "persiste[d] in using a certain drug after awareness that the drug was making the patient worse," and deliberately treated Tarik "with an inappropriate drug for no valid reason." (Pl.'s Br. at 8.)

---

[4] Defendants seem to conflate this standard with a physician's "deliberate indifference" in diagnosing or treating an incarcerated patient. (*See* Defs.' Br. at 22–23.) However, that standard derives from an inmate's § 1983 claim alleging deliberate indifference to medical needs in violation of the Eighth Amendment. *See, e.g.*, *Giles v. Kearney*, 571 F.3d 318, 330 (3d Cir. 2009) ("The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'" (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994))). As a result, the cases on which Defendants rely in this regard are inapposite.

This Court disagrees.  It is undisputed that Tarik episodically initiated violent incidents involving staff and patients while he was institutionalized.  Defendant Ansari testified that he prescribed Thorazine "to deter [Tarik's] violence, to see if it would help him, because nothing else [was] working."  (Ansari Dep. 71:5–72:7.)  His deposition testimony refutes most of Plaintiff's baseless claims, and the remaining are simply not tenable without expert medical testimony.  *See supra* note 2 and accompanying text (providing Defendant Ansari's deposition testimony); *cf. Laufgas v. Speziale*, 2006 U.S. Dist. LEXIS 70522, at *8–9 (D.N.J. Sep. 26, 2006) (granting summary judgment and dismissing all due process claims against medical defendants "[b]ecause the negligence in a medical malpractice action encompasses matters not within the ordinary knowledge and experience of lay persons" so "plaintiff is required to demonstrate a substantial departure from accepted professional judgment, practice or standards through the use of an expert").  Mindful that a medical professional's treatment decision is "presumptively valid," *Youngberg*, 457 U.S. at 322–23, this Court will not second-guess Defendant Ansari's decision to prescribe Thorazine for a second time without an opposing opinion from a medical expert.

Even if Plaintiff were to present evidence that a different drug or some other type of medicinal alternative was available at the time, "[m]ere negligence is never sufficient for substantive due process liability."  *Nicini v. Morra*, 212 F.3d 798, 810 (3d Cir. 2000) (citing *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986)).  Instead, Plaintiff must prove behavior "so egregious, so outrageous that it may fairly be said to shock the contemporary conscience.'"  *Deavers v. Santiago*, 243 F. App'x 719, 722 (3d Cir. 2007) (quoting *Cnty. of Sacramento v.*

*Lewis*, 523 U.S. 833, 847 n.8 (1998)).  We simply do not have that here.  Accordingly, Defendant Ansari is entitled to summary judgment on this claim.[5]

2.      <u>Transfer to More Restrictive Housing: Defendant Chacinski</u>

Plaintiff alleges that Defendant Chacinski placed Tarik in housing that was more restrictive than necessary as a form of punishment, violating his right to due process under the Fourteenth Amendment.  More specifically, Plaintiff alleges that Defendant Chacinksi inappropriately prescribed Thorazine, which in part caused the incident on September 16, 2011, which directly led to his placement in ITU on September 19, 2011.  (*See* 5th Amend. Compl. at 6–7.)  The placement into ITU, Plaintiff argues, was excessive and revealed an express intent to punish without being related to a legitimate non-punitive government purpose.  (Pl.'s Br. at 26.)

At the outset, the parties seem to agree that the standard from *Bell v. Wolfish*, 441 U.S. 520, 536 (1979), analyzing a pre-trial detainee's liberty interest in freedom from punishment before sentencing, applies here.  (*Compare* Pl.'s Br. at 24–25, *with* Defs.' Reply at 7–8, ECF No. 101.)  Of course, consistent with *Bell*, "[t]he Fourteenth Amendment requires that committed persons not be subjected to conditions that amount to punishment."  *Grohs v. Santiago*, 2014 U.S. Dist. LEXIS 130139, at *8 (D.N.J. Sep. 17, 2014) (citing *Bell*, 441 U.S. at 536) (analyzing due process claims of civilly committed persons).  But *Youngberg* also "set[] forth 'the proper balance between the interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraints.'"  *Clark v. Cohen*, 794

---

[5] Plaintiff makes hay out of the allegation that Defendant Ansari omitted from the discharge summary that he prescribed Thorazine (*see, e.g.*, Pl.'s Br. at 8), but Plaintiff fails to explain how exactly this omission, obviously occurring after the prescribing of Thorazine, would constitute a "substantial departure from accepted professional judgment" vis-à-vis the actual decision to prescribe Thorazine.

F.2d 79, 87 (3d Cir. 1986) (quoting *Youngberg*, 457 U.S. at 321–25) (analyzing substantive due process claim of civilly committed person placed in restrictive environment). Therefore, the Court must determine whether (1) pursuant to *Bell*, Tarik's placement in ITU was not reasonably related to a legitimate goal and thus imposed for purposes of punishment; or (2) pursuant to *Youngberg*, the level of restraint and restrictiveness in ITU was not reasonable under the circumstances. *See Stevenson v. Carroll*, 495 F.3d 62, 67–68 (3d Cir. 2007) (citing *Bell*, 441 U.S. at 537–38); *Clark*, 794 F.2d at 87 (citing *Youngberg*, 457 U.S. at 321–25).

Under either prong, genuine issues of material fact prevent summary judgment. First, Plaintiff challenges the severity of the factual allegations underlying Tarik's placement in ITU. On the date of the incident, staff members found Tarik engaging in sexual conduct with another patient. (Incident Report 1 at 1.) Placement in ITU is appropriate only if the patient is becoming violent or self-injurious, requiring an increased level of supervision. (Pl.'s Suppl. SUMF at 2.) Dr. Robert Roth, staff clinical psychiatrist at Defendant AKFC, testified that ITU is reserved for someone who has been fighting, is in poor control, or is a danger to themselves or others. (Roth Dep. 14:12-19, ECF No. 94-4.) Placement in ITU is a last resort in order to resolve a "crisis" where "nothing else has worked." (*Id.* 25:15–23.) Plaintiff submits that this incident did not require this level of isolation and seclusion.

Second, Plaintiff intimates that other, less restrictive alternatives were available at the time. For example, Tarik could have been placed on Periodic Visual Observation ("PVO"). PVO is where a staff member observes the patient at least four times per hour and documents his behavior; the maximum amount of time for PVO is seventy-two hours, unless a renewal order is authorized. (Pl.'s Suppl. SUMF at 4.) Tarik also could have been placed in Seclusion + Observation ("S+O"). S+O is appropriate where there is an imminent concern for violence. (*Id.*

at 3.)  It is used to reduce the risk of an assault by an agitated patient and serves as somewhat of an intervention to calm him or her down.  (*Id.*)  The time-period for S+O is open-ended until staff members reassess the patient.  (*Id.* at 4.)  Plaintiff contends that either of these alternatives would have been appropriate.

But even if ITU was appropriate at the time of the incident, the appropriateness was not everlasting.  Incident Report 1, dated the day of the incident, September 16, 2011, indicates that Tarik was placed in S+O at the time of the incident for engaging in sexual conduct with another patient.  (Incident Report 1 at 2.)  But Defendant Chacinski ordered that Tarik be placed in the more restrictive ITU three days later when he returned from the weekend on September 19, presumably after Tarik's stability had improved. (Chacinski Dep. 39:18–40:21, ECF No. 94-6.)  And Incident Report 2, dated roughly two weeks after the incident on October 3, 2011, indicates that Tarik was placed in ITU at the time of the incident "for assaultive behavior toward other peer."  (Incident Report 2 at 2.)  Not only are the two incident reports inconsistent, but the Court is unclear as to how long Tarik was subject to ITU—an obscurity that must be viewed in the light most favorable to Plaintiff, the non-movant—especially considering Dr. Roth's notes one month after the incident suggesting that Tarik may have still been in the ITU at the time:

> Q:     Is there any indication at or about the time of your notes on November 16, 2011 why Tarik could not be transferred to a less restrictive unit?
> A:     No.
> Q:     Do you know a reason . . . as of November 16, 2011 that Tarik could not be transferred to a less restrictive unit?
> A:     I don't know, no.

(Roth Dep. 56:24–57:2, ECF No. 94-4.)

Because factual disputes exist over why the more restrictive environment of ITU was selected in the first place, how long after the incident and under what circumstances Tarik was

placed in ITU, and exactly how long he was kept there and the progress of his stability during that time, summary judgment is not warranted at this time. *Cf. Clark*, 794 F.2d at 87 (affirming district court's finding of fact that institutionalized patient's substantive due process rights were violated where professionals agreed that she should have been placed in a far less restrictive environment). Accordingly, Defendants' Motion is denied in this regard.[6]

      B.    *Whether a Clearly Established Right Was Violated*

Having determined that sufficient evidence exists in connection with Defendant Chacinski's decision to place Tarik in ITU that a reasonable jury could find that he violated Tarik's right to due process, the Court turns to whether that right was clearly established.[7] This inquiry focuses on "whether the right that was violated was clearly established, or, in other words, 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Curley*, 499 F.3d at 206–07 (quoting *Saucier*, 533 U.S. at 202). At this point in the qualified-immunity analysis, room for sensible disagreement about the application of law is not enough. *See White v. Pauly*, 137 S. Ct. 548, 552 (2017). Instead, "[t]he inquiry focuses on the state of the relevant law when the violation allegedly occurred" because "[f]or a right to have been 'clearly established,' 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 570 (3d Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

---

[6] Plaintiff also argues that "[r]easonable jurors could infer that overmedication on Thorazine explained Tarik's behavior." (Pl.'s Br. at 29.) However, not only is the overmedication inference beyond the pale of a lay juror, but it inappropriately imports the motivations behind Tarik's inappropriate behavior to Defendant Chacinski's decision to place him in ITU. Even if it were true that Tarik was reacting poorly to his medication, that presumably would supply justification to isolate him until his medication stabilized.

[7] The Court need not analyze whether Defendant Ansari's conduct violated a clearly established right because, as discussed *supra* Section I.A.1, those constitutional claims are dismissed.

A clearly established right is at the center of this litigation. Regardless of whether one interprets it to be the right to appropriate treatment or the right to a less restrictive environment while confined by the state, *see Clark*, 794 F.2d at 87 (affirming district court's finding of fact that institutionalized patient's substantive due process rights were violated where professionals agreed that she should have been placed in a far less restrictive environment), or whether it is the right to be free from confinement for purposes of punishment, *see Bistrian v. Levi*, 696 F.3d 352, 372–75 (3d Cir. 2012) (finding reasonable inference that time spent in administrative detention was excessive in light of any legitimate non-punitive government purpose for his segregation), the factual allegations here touch upon a clearly established right. Accordingly, Defendant Chacinksi is not entitled to qualified immunity.

## II. State Statutory Violations against Defendants AKFC, Ancora, Ansari, and Chacinski (Count IV)

Plaintiff asserts a variety of state-law violations. Plaintiff does not cite to the applicable subsections in the Fifth Amended Complaint, but one may glean from the statutes that these allegations center on procedural defects, overmedication, abuse, and seclusion.[8] Most of these statutory claims fail, however.

---

[8] *See* N.J.S.A. § 30:4-24 (outlining "general principles" to govern the admission and commitment of persons with mental illness), 4-24.1 (conferring "fundamental civil rights and medical care" to persons with mental illness), 4-24.2 (describing rights of patients, such as the right to be free from unnecessary or excessive medication and the right to be free from physical restraint and isolation), 4-27.1 (finding and declaring that the state must care, treat, and rehabilitate mentally ill persons who are disabled and are not able to care for themselves "[b]ecause involuntary commitment to treatment entails certain deprivations of liberty, it is necessary that State law balance the basic value of liberty with the need for safety and treatment"), 4-27.13 (requiring notice of hearing), 4-27.14 (detailing rights of patient at hearing), 4-27.16 (outlining court review hearings); N.J.S.A. §§ 30:6D-4 (limiting presumptions and discriminations against persons with developmental disabilities who have been admitted to a facility), 6D-5 (prohibiting persons with developmental disabilities from, *inter alia*, being subjected to corporal punishment, administered inappropriate medication, or physically

18

First, the statutes detailing the requirements for notice of and rights at a court hearing are inapplicable. No allegations in the Fifth Amended Complaint, nor any advanced in this briefing, address procedural due process or procedural defects surrounding a hearing. Therefore, these statutory claims are dismissed.

Second, the statutes focusing on overmedication are necessarily subsumed within the § 1983 claim for a substantive due process violation against Defendant Ansari. Because these alleged statutory violations track the same analysis as the § 1983 claim and because Plaintiff's § 1983 claim fails, these statutory claims fail as well.

Third, the statutes involving alleged abuse must also fail. Specifically, Plaintiff avers that Tarik told her that staff members at Defendant AKFC punched him in the eye, starved him, encouraged him to punch walls causing abrasions on his knuckles, neglected him to the point of contracting MRSA and allowing him to sleep in his own urine, hit him during the night, shackled and restrained him, and held him while other patients punched him. (Pl.'s Suppl. SUMF at 28–29.) Those allegations, however, are entirely dependent on conversations between Plaintiff and Tarik, who the parties agree is legally incompetent and who at the time had been involuntarily civilly committed. (*See* Pl.'s Resp. to Defs.' SUMF ¶ 1, ECF No. 95.) Although a district court may rely on hearsay evidence during summary-judgment briefing, it may be considered only "if the out-of-court declarant could later present that evidence through direct testimony, *i.e.* 'in a form that would be admissible at trial.'" *Williams v. W. Chester*, 891 F.2d 458, 465 n.12 (3d Cir. 1989) (relying on *Celotex*, 477 U.S. at 324, 327); *see also Nichols v. Bennett Detective &*

---

restrained or isolated), 6D-9 (requiring facilities serving persons with developmental disabilities to "be designed to maximize the developmental potential of such persons and . . . provide[] in a humane manner in accordance with generally accepted standards for the delivery of such service").

*Protective Agency, Inc.*, 245 F. App'x 224, 229 (3d Cir. 2007) (affirming grant of summary judgment for defendant where district court excluded statements as hearsay). The declarant, Tarik, is legally incompetent to testify or execute an affidavit, so Rule 807 of the Federal Rules of Evidence (providing residual exception to hearsay where "the statement has equivalent circumstantial guarantees of trustworthiness") is inapplicable. Because Plaintiff has failed to produce any testimony or affidavit from someone who witnessed this alleged abuse despite full discovery (*see* Pl.'s Resp. to Defs.' SUMF ¶ 18), these statutory claims fail.

Plaintiff's statutory claims survive, however, to the extent that they broach Tarik's placement in ITU. The parallel § 1983 claim against Defendant Chacinski survives this Motion for Summary Judgment, *see supra* Section I.A.2, so the statutory claims should as well. Accordingly, summary judgment is entered in favor of Defendants AKFC, Ancora, and Ansari on all statutory claims in Count IV, but the claims survive against Defendant Chacinski to the extent that they implicate Tarik's placement in ITU.

## III. Discrimination under the ADA and NJLAD against Defendant AKFC (Count V)

Plaintiff alleges that Defendant AKFC and its staff members discriminated against Tarik by abusing and isolating him, thus depriving him of the same services given to the other patients. (5th Am. Compl. at 19–21.) She contends that this discrimination violated Title II of the ADA and the NJLAD.

### A. *Discrimination under the ADA*

"Title II of the ADA prohibits discrimination against the disabled in public services, programs, and activities." *Disability Rights N.J., Inc. v. Comm'r, N.J. Dep't of Human Servs.*, 796 F.3d 293, 301 (3d Cir. 2015) (citing *Tennessee v. Lane*, 541 U.S. 509, 517 (2004)). It provides that "no qualified individual with a disability shall, by reason of such disability, be

excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. "[T]he phrase 'service, program, or activity' is extremely broad in scope and includes 'anything a public entity does.'" *Disability Rights N.J.*, 796 F.3d at 301 (citing 28 C.F.R. § 35.130(b)(1)(vii); *Yeskey v. Pa. Dep't of Corr.*, 118 F.3d 168, 171 (3d Cir. 1997)). To allege a *prima facie* violation, the plaintiff must demonstrate that "(1) he is a qualified individual; (2) with a disability; (3) [who] was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability." *Haberle v. Troxell*, 885 F.3d 171, 178–79 (3d Cir. 2018) (quoting *Bowers v. NCAA*, 475 F.3d 524, 553 n.32 (3d Cir. 2007)). Defendants challenge only the latter two elements. (*See* Defs.' Br. at 29.)

In regard to the third prong, Plaintiff concedes in her Opposition that "Tarik was not excluded" from *participation in* a service, program, or activity of a public entity. (Pl.'s Br. at 16.) Though she contends that Tarik was instead denied a *benefit of* a service, program, or activity, she never identified a specific service, program, or activity from which Tarik was denied or specified the scope of that denial. (*See id.* at 16–18.) Rather, Plaintiff simply regurgitates black-letter law.

Plaintiff also fails to satisfy the fourth prong. No evidence presented to this Court demonstrates that Tarik was placed, and remained for a period of time, in ITU after the September 16 incident "by reason of his disability." Of course the Court finds that questions remain regarding Count III and the constitutionality of Tarik's placement and prolongment in ITU, *see supra* Section I.A.2, but those questions begin and end there. Indeed, in her Opposition, Plaintiff simply takes the arguments advanced for her due process claim and refashions them for her discrimination claim. (*See, e.g.*, Pl.'s Br. at 22 (arguing that "reasonable

jurors could conclude that Tarik's transfer to more restrictive housing . . . was a form of unnecessary segregation, thus disparate treatment from the services provided to his peers").)

Discrimination under the ADA requires causation, but there is no sign of animus or pretext by Defendants in regard to Tarik's disability or that Tarik was treated differently compared to his peers. *See CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 236 (3d Cir. 2013) (expounding on causation requirements that plaintiffs "must prove that they were treated differently based on the protected characteristic"); *See Burton v. Teleflex Inc.*, 707 F.3d 417, 427 (3d Cir. 2013) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)) (explaining that "[t]o make a showing of pretext, 'the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the [defendant's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the [defendant's] action'"). Rather, the evidence presented suggests that Defendants simply sought to stabilize Tarik's undisputedly inappropriate behavior. Accordingly, summary judgment is entered in favor of Defendants on this claim.

B. *Discrimination under the NJLAD*

The NJLAD prohibits any place of public accommodation from refusing, withholding, or denying any accommodation, advantage, facility, or privilege thereof from any person on the account of disability. N.J.S.A. § 10:5-12(f). Like the ADA, the NJLAD also requires a causation element—that the plaintiff "was denied equal treatment *on the basis of* [his or her disability]." *See Islam v. City of Bridgeton*, 804 F. Supp. 2d 190, 200 (D.N.J. 2011) (emphasis added) (detailing elements). For the same reasons discussed above, therefore, this claim fails and summary judgment is entered in favor of Defendants.

**IV.     Retaliation under the ADA and NJLAD against Defendant AKFC (Count VI)**

Although Defendants contend that the "Fifth Amended Complaint should be dismissed with prejudice as to all [D]efendants in its entirety" (Defs.' Br. at 33; *see also* Defs.' Reply at 20), Defendants offer no argument as to why Count VI, retaliation under the ADA and NJLAD, should be dismissed. Save for a reference of the claim in their "Preliminary Statement" section in their opening brief, Defendants do not even mention the word "retaliation" in their papers. This omission is striking in light of the fact that Plaintiff, unprompted, addressed the retaliation claim in her Opposition (Pl.'s Br. at 20–24), yet Defendants failed to provide a rejoinder in their Reply. Because one need not prevail on a discrimination claim to prevail on a retaliation claim, summary judgement is denied and this Count survives Defendants' Motion.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part. An appropriate Order will follow.


Date:   07/24/2019                                          */s/ Anne E. Thompson*
                                                                        ANNE E. THOMPSON, U.S.D.J.